

THE HONORABLE
Nicholas G. Garaufis
United States District Judge
Eastern District of New York
225 Cadman Plaza, East
Brooklyn, New York  11201

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT, E.D.N.Y.
★ JAN 25 2006 ★
BROOKLYN OFFICE

January 17, 2006

Re:  Defiance to your Recommendations

Dear Honorable Judge:

　　　I really want to apologize for believing that I really got the shaft by the Court when you recommended I be incarcerated near my family and the result was just the opposite.  But, at FCI Beaumont, Texas I read the letter explaining to you by the Bureau of Prisons that your recommendations would not be followed.  I really am writing just for informational purposes, to let you know what really goes on behind your back.  I have finally gotten to the bottom of this all and found out that the BOP's (sic) reasoning was based upon lies.

　　　At first glance, I thought it was AUSA Andres who sandbagged me.  But, have discovered it could only be AUSA Northernbrook, because this happened once before.  I speak of the intentional and deliberate lies in the attached SECURITY DESIGNATION Data Sheet that I have highlighted.  This could have come from nowhere else.

　　　I just want you to know that AUSA Northernbrook has a vendetta against me and my family.  This stems her 1985 foiled indictment she could not attain.  This also surfaced again in 1990 before District Judge Nickerson who asked for a factual basis for a plea and I had honestly been confused and let him know that I did not know what I had done wrong.  When I told Judge Nickerson that he threw AUSA Northernbrook out of his courtroom because of a tantrum.  Northernbrook was embarrassed and it was media-covered.  She then caused preparation of a PSI (sic) that was ludicrous and has been attempting to prejudice me ever since.  At a subsequent Fatico hearing Judge Nickerson threw all these outlandish allegations and innuendos out.  Again, she was humiliated by the press coverage.

　　　Because of this plethora of lies being put in the attached designation sheet, I never was able to receive a visit from my sister who has since passed away and was unable to come see me; my daughter has cancer and is unable to travel so far to see me; and my innocent grandsons also long to see their grandfather.  I have been to the hospital eight (8) times and the medical staff are unable to do anything for me.  You may not be able to imagine what I have been through as far as pain, agony and trauma.  Yet, my body continues to deteriorate.  Not to mention the emotional affect this has caused me, and especially my family.  This all could be proven !

　　　Honorable Judge Garaufis, I just want you to know that these things happened albeit the Government stood there so pleasantly in open court, and led us all to believe I was going to be situated in a prison near home.  I have also attached evidence that these allegations are completely manufactured and fabricated by the Government. Yet, I still suffer, and most poignantly, does my family.

　　　I appreciate you hearing me out and again apologize for having taken up your valuable time.

                              Utterly Dismayed, I Remain:

                              ✗

                              Anthony Graziano No. 48743-080

cc: file

Case 1:02-cr-00307-NGG   Document 915   Filed 01/25/06   Page 2 of 12 PageID #: 820

```
              REGNO: 48743-080   NAME: GRAZIANO, ANTHONY                  9:29:04
RC/SEX/AGE: W/M/63   FORM D/T: 01-23-2004/0801                            ORG: BOP
OFFN/CHG..: CTC RKTRNG,AT EVADE TAX-108MOS/*CC*W/SDFL=CT ENGAGE IN RKTR  RES: STATEN ISLAND, NY 10312
            INFLUENCE CORRPT ORG(RICO)-135MO/DKT:CR02307&02CR60049-001
CUSTODY...: IN        BIL:                CR HX PT: 6     CAR: CARE3
CITIZENSHP: UNITED STATES OF AMERICA   PUB SAFETY: GRT SVRTY
CIM CONSID: SEPARATION
                                                              USM: ENY
JUDGE.....: N. GARAUFIS   REC FACL: OTV/FAI/MED       REC PROG: NONE
DETAINER..: NONE          SEVERITY: GREATEST          MOS REL.: 114
PRIOR.....: SERIOUS       ESCAPES.: NONE              VIOLENCE: > 10 YRS MINOR
PRECOMMT..: N/A           V/S DATE:                   V/S LOC.:
OMDT REF..: NO            SEC TOT.: 11              SCORED LEV: MEDIUM
CCM RMKS..: US CTZ;IR:'91/203;NICKNM=T.G.;INST:OC,SUBJ=HIGH-RANKING CAPT,
            MURDER CONSPRCY,LNSHRK,CTD COC/CRK&MRJ,ROBBRY,ROBBRY CNSPRCY,
            GMBLNG,OBSTRCT JSTC,15MURDERS;PR:BRGLRY(UNK),AT CRM USURY($),
            FLS STMNTS,CTC RKTRNG;OTH:RBBRY;MED/PSY:OMDT.HEB
DESIG: BEAUMONT FCI-MED       NER ELT 01-26-2004 RSN: LEVEL   MSL:
MGTV/MVED.:
DESIG RMKS: JUD REC NOT FOLLOWED; LETTER SENT TO COURT. INMATE DESIGNATED
            OUTSIDE NER AWAY FROM SPHERE OF INFLUENCE.


G0002       MORE PAGES TO FOLLOW . . .
```

HOFFMAN & POLLOK LLP
ATTORNEYS AT LAW
260 MADISON AVENUE
NEW YORK, N.Y. 10016
(212) 679-2900
FAX NO: (212) 679-1844

JEFFREY C. HOFFMAN
JOHN L. POLLOK
SUSAN C. WOLFE
WILLIAM A. ROME
LISA ROSENTHAL
JACQUELINE N. LAND

MICHAEL S. POLLOK
OF COUNSEL

ROBERT H. KIERNAN
(1973 - 1995)

May 2, 2005

Mr. Stephen Pullen, Caseworker
FCI Forrest City Medium
P.O. Box 7000
Forrest City, AR 72336

RE: **ANTHONY GRAZIANO**, Inmate No. 48743-080

Dear Mr. Pullen:

We have been advised by the Bureau of Prisons that the appropriate manner in which to correct a security designation sheet is by forwarding the information to the Inmate's caseworker. Therefore, this letter is written with reference to the security designation information of ANTHONY GRAZIANO, (a copy of which is enclosed). The designation indicates, among other crimes listed, "15 murders and obstruction of justice." We object to this designation and ask that be corrected. As to the 15 murders, while we have no understanding where this information came from, please find enclosed a copy of Page 4 of the Addendum to the Presentence Investigative Report for Anthony Graziano in *United States v. Graziano*, 02-60049 CR (Hurley) in the Southern District of Florida.

As you can see, the last paragraph of the Addendum states that the only murder conspiracy against Mr. Graziano was contained in the indictment from the Eastern District of New York entitled *United States v. Graziano*, CR 02-0307 (S2) (NGG). Mr. Graziano's sentence was the result of both the aforementioned indictments running concurrently. You will note that the Addendum explicitly exonerates Mr. Graziano from any violence and states that "the government in New York conceded that it had no evidence that the defendant committed or commanded any act of violence."

There is also no allegation that Mr. Graziano was involved in obstruction of justice. Although in the Eastern District of New York Indictment, there is an allegation against another defendant contained in Racketeering Act 22 for obstruction of justice.

HOFFMAN & POLLOK LLP

Page 5
June 27, 2003

More particularly, Mr. Hoffman has no recollection of the allegations on page 60 regarding Mr. Graziano's undisclosed ownership of various properties and he is certain that those allegations were never proven.

We therefore request that the last paragraph of page 58 through the end of page 60 be omitted from the Report. In the alternative, we request the opportunity to review the materials which the Probation Department relies upon for these allegations.

10)  With respect to ¶226, Mr. Graziano pled guilty in New York to a RICO conspiracy consisting of only three specific racketeering acts: 1) conspiracy to murder Pappa and Hennigar; 2) loan sharking (extortionate extensions/collections of credit); and, 3) gambling, in addition to one count of tax evasion. He did not plead guilty to the alleged acts involving narcotics and marijuana. Therefore, the stipulated guidelines calculation in his plea agreement do not include those offenses.

In addition, with respect to the murder conspiracy which occurred in or about 1994, the Court should be aware that, according to representations made by the New York prosecutors at a detention hearing, the conspiracy was aborted by Graziano who, according to the government, "convened a 'sit down'" to address the fact that the purported victims-to-be had shot someone. At Graziano's detention hearing in New York, after reviewing the government's proffer and the defense submission, Magistrate Judge Chrein directly inquired of the government whether it had any evidence that Graziano specifically committed or commanded any act of violence that was carried out. The government conceded that it had no such evidence. (Transcript of 4/12/2002 at p. 13).

11)  With respect to ¶70, Mr. Graziano owned a restaurant about 25 years *ago* (not *for* about 25 years), the name of which he could not recall.

Finally, I have enclosed Mr. Graziano's signed financial statement. In addition, we have sent the PSI to Mr. Graziano, but, because of the distance, we have not yet reviewed it with him. We therefore wish to reserve the opportunity to make any additional objections to the report once Mr. Graziano has reviewed it.

involved in narcotics trafficking for decades. Over the years, narcotics distribution has grown more sophisticated, utilizing cellular telephones, pagers, fax machines, and other communication conveniences. Reynolds, an associate of the Luchese Family, was the sole wholesale supplier of cocaine to the Bonanno Family and others. He supplied a large-scale cocaine "beeper business" operated by various members of **Anthony Graziano's** crew in the Bay Ridge and Bensonhurst sections of Brooklyn. Reynolds delivered the cocaine to the crew himself or through intermediaries. He arranged for the transportation of the cocaine as well as the cocaine proceeds. The Government and case agents advised that between January 1994 and October 1996, Reynolds conspired to distribute at least a conservatively-estimated 3 kilograms of cocaine. ~~Although Graziano is named in the indictment, the Government has advised that there is not a preponderance of evidence to support a conviction on this count.~~

## Count 1 - Racketeering Acts 14A & 14B:  Robbery Conspiracy & Robbery

27.   Between August 1, 1995, and August 18, 1995, Hector Pagan, with others, conspired to rob and robbed an employee of a newspaper delivery truck in New York, New York.

28.   According to a confidential witness, on August 18, 1995, Hector Pagan, with others known to the Government, robbed a New York Times delivery truck. The robbery crew was provided information regarding the truck route by an unidentified New York Times employee and expected the truck to carry $15,000. On the morning of the robbery, Pagan brandishing a .25mm firearm, approached the truck driver, Walter Bauer, from behind during one of his stops in Manhattan, pushed him face down in the back of the truck and stated, "Don't make a move and you won't get hurt. We're only trying to make a living. Give us all your money." An unidentified co-defendant handcuffed Mr. Bauer to the vehicle. The driver gave Pagan and his accomplice approximately $600. The money was never recovered.

## Count 1 - Racketeering Act 16:  Illegal Gambling / Sports Betting

29.   Between January 1991 and December 1996, Francesco Fiordilino, Joseph Grimaldi and Vito Grimaldi (Joseph Grimaldi's father), with others, advanced and profited from unlawful gambling activity by engaging in bookmaking, in that they received and accepted in any one day more than five bets totaling more than $5,000. According to the Government, Joseph Grimaldi operated a gambling concern from a café in Queens. It was supervised by Vito Grimaldi. If there were issues to resolve, such as non-payment of debts, Vito Grimaldi would meet with representatives of the debtor (such as representatives from other organized crime

12

families) to resolve the situation.  Joseph Grimaldi and Vito Grimaldi paid a percentage of their profits as tribute to an unidentified Bonanno Family captain, and both supervised other unidentified participants in the gambling operation.

## Count 1 - Racketeering Act 22:  Obstruction of Justice / John Calandra

30.    Between June 1999 and September 1999, Andrew Reynolds, with others, knowingly and corruptly persuaded John Calandra, an associate of the Bonanno Family, to alter, destroy, mutilate and conceal a tattoo on his ankle, with intent to impair the object's integrity and availability for use in the criminal trial of *United States v. Joseph Benanti, et al.*, Docket Number 99-CR-520 (ERK).  According to case agents and the Government, seven members of the Bath Avenue crew of the Bonanno Family were adorned with ankle tattoos (the numerals 1 through 7) signifying their position as "shooters."  Subsequent to subpoena's issued to the seven individuals to present their tattoos for photographic documentation, Reynolds directed Calandra to "get rid of" his tattoo in order to evade law enforcement identification.  As a result, Calandra subsequently had a tattoo drawn over his numeric tattoo.

## Count 1 - Racketeering Act 23:  Extortion Conspiracy / Stephen Gallo

31.    In August 1999, Hector Pagan conspired with others known to the Government to obstruct, delay and affect commerce, and the movement of articles and commodities in commerce, by extortion, in that the Pagan and the co-conspirators agreed to obtain the proceeds of drug trafficking, from Stephen Gallo, without his consent, through actual and threatened force, violence and fear.  The Government is in possession of an audio recording from August 9, 1999, of Anthony Graziano "yelling and screaming" at Hector Pagan to get $5,000 from Gallo by "whatever means necessary."  As Graziano became more enraged, he increased the dollar amount to $10,000.  Stephen Gallo is currently in federal custody on related charges.  **Although Graziano is named in the indictment, the Government has advised that there is not a preponderance of evidence to support a conviction on this count.**

## Count 1 - Racketeering Act 25 & Docket 02-CR-307(S-4):  Loansharking Conspiracy

32.    Between January 1993 and December 1999, Jack Dildabanian and **Anthony Graziano**, with others, conspired to make extortionate extensions of credit, and Jack Dildabanian, with others, conspired to use extortionate means to collect extensions of credit.  These debts were unenforceable under State of New York

13

and federal laws (see ¶ 25). Jack Dildabanian and **Anthony Graziano**, with others, loaned money to others at an illegal rate of interest. The **Graziano**-Dildabanian operation was funded, in part, by Joseph Massino. Individuals who borrowed money from the defendants understood that if they did not re-pay the loan plus interest, they would be subject to threats of violence as well as actual acts of violence. During the loansharking conspiracy, **Anthony Graziano** would approve the loans but the loan recipients would go to Jack Dildabanian for the cash and to make their interest payments (known as "vig," "points," or "juice;" loanshark slang for excessive interest), which varied depending on the amount of the loan. According to case agents, numerous cooperating witnesses were loan recipients. They received loans from **Anthony Graziano** and Jack Dildabanian up to and including $60,000 for the purpose of "pushing" this money out on the streets as loans to other customers. **Anthony Graziano** and Jack Dildabanian charged one point on the loans; the witnesses charged anywhere from 2% to 5% interest per week.

## Count 1 - Racketeering Act 26 & Count 11: Conspiracy to Distribute Marijuana

33.  Between January 1991 and January 2000, Peter Cosoleto, Jack Dildabanian, John Fasano, Stephen LoCurto, and Hector Pagan, with others, conspired to distribute and possessed with intent to distribute marijuana, in an amount in excess of one hundred kilograms. According to the Government, based on wiretap evidence the co-conspirators were involved in distributing bulk quantities of marijuana throughout Staten Island and Brooklyn on the wholesale level.

34.  According to the Government, John Fasano facilitated the sale of bulk quantities of marijuana to other associates of organized crime families. Pagan was a major distributor who sold marijuana to LoCurto. Fasano admitted to distributing at least 100 kilograms of marijuana. LoCurto admitted to distributing at least 40 kilograms of marijuana. Pagan admitted to distributing at least 80 kilograms of marijuana. To date, neither the Government nor case agents have provided additional information. **Although Anthony Graziano is named in the indictment, the Government has advised that there is not a preponderance of evidence to support a conviction on this count.**

## Count 1 - Racketeering Act 27: Illegal Gambling / Sports Betting

35.  Between January 1995 and June 2000, Robert Lino, Andrew Reynolds, and William Riviello, with others, advanced and profited from unlawful gambling activity by engaging in bookmaking, in that they received and accepted in any one day more than five bets totaling more than $5,000.

36.  Andrew Reynolds profited from an illegal Bonanno Family sports gambling "wire room" (see description, ¶ 20) operating in an unspecified apartment on Staten

62. Frank Porco, a Bonanno Family captain, surrendered on March 21, 2002, and made no post-arrest statements. According to the Government, Porco was not an organizer, leader, manager, or supervisor of either the gambling or loansharking operation; however, he cannot be considered a minimal or minor participant. Therefore, neither an aggravating nor mitigating role adjustment is warranted.

63. Andrew Reynolds, an associate of the Luchese Family, was arrested while in federal custody on March 19, 2002. He made no post-arrest statements. Andrew Reynolds' close association with the Bonanno Family is due to his son, Thomas Reynolds, a Bonanno Family associate. Andrew Reynolds is accountable for a conservatively-estimated 3 kilograms of cocaine. He cannot be described as an organizer, leader, manager, or supervisor of the Luchese Family, in the conspiracy to distribute cocaine, or the illegal gambling / sports betting operation (although he monitored another individual who took bets), and an aggravating role adjustment is not warranted. However, his participation cannot be described as either minimal or minor, and a mitigating role adjustment is not warranted.

GJELAJ/CMF

Adjustment for Obstruction of Justice

64. The probation officer has no information suggesting that the defendant impeded or obstructed justice.

Adjustment for Acceptance of Responsibility

65. The defendant pleaded guilty, and notified the Government of his intention to do so in a timely manner. During the presentence interview, at the request of defense counsel, the probation officer asked no questions about the instant offense. Nevertheless, since the defendant pleaded guilty, sparing the Government the burden of preparing for trial, an adjustment for acceptance of responsibility is deemed warranted.

Offense Level Computation

66. Count One of the second superseding indictment charges a conspiracy to commit more than one offense. Guideline 1B1.2(d) states that "[a] conviction on a count charging a conspiracy to commit more than one offense shall be treated as if the defendant had been convicted on a separate count of conspiracy for each offense that the defendant conspired to commit."

67. The guideline for Count One, a violation of 18 U.S.C. §§ 1962(d) and 1963, is 2E1.1, which directs that the greater base offense level be applied: either the alternative minimum level specified, 19, or the combined adjusted offense level

24

102. Count 1 - Racketeering Act 25:
Loansharking Conspiracy:
Adjusted Offense Level . . . . . . . . . . . . . 24                    ½

103. Total Number of Units:                                          2½

104. Greater of the Adjusted Offense Levels Above:                   __32__

105. Increase in Offense Level (see Guideline 3D1.4):               __3__

106. Combined Adjusted Offense Level:                                __35__

107. Adjustment for Acceptance of Responsibility:  The defendant pleaded guilty, and
notified the Government of his intention to do so in a timely manner.  Per
Guidelines 3E1.1(a) and 3E1.1(b)(2), 3 levels are subtracted.        __-3__

108. Total Offense Level:                                            __32__


## PART B.  THE DEFENDANT'S CRIMINAL HISTORY

### Convictions/Adjudications

| | Date of<br>Arrest | Offense/Court | Disposition | Guidelines/<br>Points |
|---|---|---|---|---|
| 109. | 6/28/60<br>(Age 19) | Burglary/<br>Criminal Court<br>New York, NY | 8/16/60<br>Unknown | 4A1.2(e)(3)<br><br>__0__ |

110. This arrest appears on the defendant's National Criminal Information Center
(NCIC) report.  The disposition data column states "convicted."  In addition, the
report indicates that the defendant may also have been charged with Disorderly
Conduct.  The conviction on that charge was not specified.  The arrest report and
verification of the disposition have been requested.

| | | | | |
|---|---|---|---|---|
| 111. | 1/10/84<br>(Age 41) | Attempted Criminal<br>Usury-2nd Degree/<br>Supreme Court<br>Brooklyn, NY | 5/29/85<br>Conditional discharge;<br>$10,000 fine | 4A1.2(c)<br><br>__0__ |

112. This arrest appears on the defendant's NCIC report.  The arrest report has been
requested.  Court officials verified the disposition.

25

| | | | | | |
|---|---|---|---|---|---|
| 113. | 4/12/90<br>(Age 49) | False Statements/<br>U.S. District Court<br>Brooklyn, NY<br>DKT # 90-CR-334<br>Nickerson, J. | 11/23/90<br>3 years custody;<br>$100,000 fine;<br>$50 special assessment<br><br>3/5/93<br>Paroled from custody<br><br>8/17/93<br>Termination of<br>Parole supervision | 4A1.1(a)<br>4A1.2(e)(1) | 3 |

114. According to the federal presentence report dated May 23, 1990, the defendant surrendered on April 12, 1990, and pled guilty that day to a single-count information charging that he wilfully evaded the payment of income taxes in excess of $50,000 due for the calendar years 1974, 1975, 1984, and 1985. The core of the charge to which the defendant pleaded guilty was his submission of a false Offer in Compromise and Statement of Financial Condition (IRS Forms 656 and 433; Offer in Compromise) regarding his tax liability for the aforementioned tax years. The documents were false in that they omitted substantial assets and income sources which the defendant had. With the aid of related defendants John Zancocchio and Vincent Rossi, with others, the defendant placed his extensive real estate and business holdings in the names of nominees in order to conceal his assets and the true amount and sources of his income from the IRS and from law enforcement authorities in general.

115. In 1990, the defendant was identified as a captain in the Bonanno Family and a regular associate of Philip Rastelli, Anthony Spero, and Joseph Massino. In his capacity as captain, he headed a crew whose criminal activities were subject to his direction. In addition, members of the crew paid the defendant a portion of the proceeds of their sanctioned criminal activities as "tribute." Zancocchio was an important member of the defendant's crew as well as his son-in-law.

116. The tax case originated in 1981, when the defendant was notified by the IRS that he had a $20,773.04 personal tax liability for the same years as a result of his participation in Graziano and Sons Transportation. The defendant neither filed returns nor paid taxes for himself and his business for the tax years in question. (The defendant subsequently accrued additional tax liabilities of $1,385.84 and $2,542.42 for the years 1984 and 1985.)

117. In an attempt to collect the tax due for the years 1973 and 1974, the IRS, on two occasions, requested that the defendant submit Offers in Compromise. The first Offer in Compromise was submitted in November 1983. In it, the defendant acknowledged owing $58,223.09 in unpaid taxes and offered to pay $25,000 in

28

| 127. | 3/19/02 (Age 62) | Conspiracy to Commit Racketeering/ U.S. District Court West Palm Beach, FL DKT # 02-60049-CR Hurley, J. | 7/18/03 135 months custody; 3 years supervised release; $1,601,306.52 restitution | 4A1.2(a)(2) | 0 |

128. According to the federal presentence report dated July 18, 2003, from April 1998 through March 12, 2002, at Broward County, in the Southern District of Florida and elsewhere, the defendant conspired to participate in racketeering activity, with John Zancocchio, Israel Torres, Frederick Scarola, Jose Perez, Angela Rubbo, Joseph Rubbo, Nicholas Rubbo, Pasquale Rubbo, Geno Parisi, John Finkelstein, David Cavallo, and others, being persons employed by and associated with the Bonanno Family. The defendant was a leader of the enterprise who, from his base of operations in New York, supervised and directed the criminal activities of the Bonanno Family in South Florida in return for a share in the illegal proceeds that the crew generated from loansharking, money laundering, mail and wire fraud, and conducting an illegal gambling business, among other crimes. He and other co-conspirators financed, supervised and made extortionate extensions of credit to victims and used extortionate means to collect extensions of credit through the use or threatened use of violence. The defendant traveled to Florida on several occasions, where he engaged in telephone and in-person conversations that were surreptitiously recorded by law enforcement.

*[handwritten margin notes: Leader of an association in fact enterprise not Bonanno family.]*

129. General evidence of the defendant's organized crime affiliation and demands for payment of tribute includes a tape recording made by cooperating witness Al Polito of a conversation with Fred Scarola on June 22, 1999, in which Scarola identifies Bonanno Family members and their positions, law enforcement surveillance of the defendant meeting with other organized crime members and associates, including having dinner with Israel Torres and others on November 19, 1999, meeting with John Zancocchio, and Israel Torres on December 6, 1999, and numerous intercepted wiretap conversations in which the payment of tribute to the defendant is discussed, particularly when the defendant travels to South Florida.

130. The defendant was a participant in, and beneficiary of, the loan shark activities involving Israel Torres and Frederick Scarola, as well as the illegal gambling business involving John Zancocchio, Jose Perez, Israel Torres, and Fred Scarola.

131. General evidence of the defendant's involvement in the loan shark and illegal gambling business activities includes a tape recording made by cooperating witness Al Polito on November 20, 1999, when the defendant harshly rebuked Polito for diverting gambling proceeds to his own use instead of borrowing money from Torres. There are also numerous intercepted wiretap conversations in which Israel

138. The defendant committed the instant offense less than two years after release from imprisonment for the conviction of November 23, 1990. Per Guideline 4A1.1(e), 1 criminal history point is added.                                                                        **1**

139. The total of the criminal history points is 6. According to the Sentencing Table (Chapter 5, Part A), 6 criminal history points establish a criminal history category of III.

**Other Arrests**

| Date of Arrest | Charge/Court | Disposition |
|---|---|---|
| 140. 6/26/59 (Age 18) | Robbery/ Criminal Court New York, NY | 7/15/59 **Dismissed or Acquitted** |

141. This arrest appears on the defendant's NCIC report. The arrest report and verification of the disposition have been requested.

142. As stated in the defendant's 1990 federal presentence report, according to a Federal Bureau of Investigation report, the defendant was arrested on February 1, 1974, by the United States Marshals in the District of New Jersey for sale of heroin. According to the defendant's current NCIC report, the charge was dismissed. In addition, the 1990 presentence report indicates that the defendant admitted to a gambling and improper loan arrest in 1985 in Brooklyn. The 1985 arrest is not reflected in the defendant's current NCIC report.

## PART C. OFFENDER CHARACTERISTICS

143. The following information was provided by the defendant on January 15, 2003, and corroborated by his former wife (with whom he is reconciled), Veronica Graziano, unless otherwise noted. Additional information was provided by the Southern District of Florida Probation Office and the defendant's 1990 presentence report prepared by the Eastern District of New York.

**Family Ties, Family Responsibilities, and Community Ties**

144. As verified by the birth certificate, the defendant was born on November 12, 1940, to the marital union of Salvatore Graziano and Francis (née) Buttacovoli. The parents divorced when the defendant was approximately nine years old. The father died in approximately 1995, at age 72, from colon cancer. According to the